# US AIRWAYS, INC. *v.* BARNETT

No. 00–1250.   Argued December 4, 2001—Decided April 29, 2002

*Walter E. Dellinger* argued the cause for petitioner. With him on the briefs were *Lawrence M. Nagin* and *Robert A. Siegel.*

*Claudia Center* argued the cause for respondent. With her on the brief were *William C. McNeill III, Eric Schnapper, Todd Schneider, Guy Wallace,* and *Robert W. Rychlik.**

JUSTICE BREYER delivered the opinion of the Court.

The Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 328, 42 U. S. C. § 12101 *et seq.* (1994 ed. and Supp. V), prohibits an employer from discriminating against an "individual with a disability" who, with "reasonable accommodation," can perform the essential functions of the job. §§ 12112(a) and (b) (1994 ed.). This case, arising in the context of summary judgment, asks us how the Act resolves a potential conflict between: (1) the interests of a disabled worker who seeks assignment to a particular position as a "reasonable accommodation," and (2) the interests of other workers with superior rights to bid for the job under an em-

---

*Briefs of *amici curiae* urging reversal were filed for the Air Transport Association of America, Inc., et al. by *John J. Gallagher* and *Margaret H. Spurlin;* and for the Equal Employment Advisory Council et al. by *Ann Elizabeth Reesman.*

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, Deborah Greenfield, James B. Coppess, Michael H. Gottesman,* and *Laurence Gold;* and for the National Employment Lawyers Association et al. by *Brian East* and *Paula A. Brantner.*

*Peter J. Petesch, Thomas J. Walsh, Jr., Timothy S. Bland,* and *David S. Harvey, Jr.,* filed a brief for the Society for Human Resource Management as *amicus curiae.*

ployer's seniority system. In such a case, does the accommodation demand trump the seniority system?

In our view, the seniority system will prevail in the run of cases. As we interpret the statute, to show that a requested accommodation conflicts with the rules of a seniority system is ordinarily to show that the accommodation is not "reasonable." Hence such a showing will entitle an employer/defendant to summary judgment on the question—unless there is more. The plaintiff remains free to present evidence of special circumstances that make "reasonable" a seniority rule exception in the particular case. And such a showing will defeat the employer's demand for summary judgment. Fed. Rule Civ. Proc. 56(e).

## I

In 1990, Robert Barnett, the plaintiff and respondent here, injured his back while working in a cargo-handling position at petitioner US Airways, Inc. He invoked seniority rights and transferred to a less physically demanding mailroom position. Under US Airways' seniority system, that position, like others, periodically became open to seniority-based employee bidding. In 1992, Barnett learned that at least two employees senior to him intended to bid for the mailroom job. He asked US Airways to accommodate his disability-imposed limitations by making an exception that would allow him to remain in the mailroom. After permitting Barnett to continue his mailroom work for five months while it considered the matter, US Airways eventually decided not to make an exception. And Barnett lost his job.

Barnett then brought this ADA suit claiming, among other things, that he was an "individual with a disability" capable of performing the essential functions of the mailroom job, that the mailroom job amounted to a "reasonable accommodation" of his disability, and that US Airways, in refusing to assign him the job, unlawfully discriminated

against him. US Airways moved for summary judgment. It supported its motion with appropriate affidavits, Fed. Rule Civ. Proc. 56, contending that its "well-established" seniority system granted other employees the right to obtain the mailroom position.

The District Court found that the undisputed facts about seniority warranted summary judgment in US Airways' favor. The Act says that an employer who fails to make "reasonable accommodations to the known physical or mental limitations of an [employee] with a disability" discriminates *"unless"* the employer "can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business." 42 U. S. C. § 12112(b)(5)(A) (emphasis added). The court said:

> "[T]he uncontroverted evidence shows that the USAir seniority system has been in place for 'decades' and governs over 14,000 USAir Agents. Moreover, seniority policies such as the one at issue in this case are common to the airline industry. Given this context, it seems clear that the USAir employees were justified in relying upon the policy. As such, any significant alteration of that policy would result in undue hardship to both the company and its non-disabled employees." App. to Pet. for Cert. 96a.

An en banc panel of the United States Court of Appeals for the Ninth Circuit reversed. It said that the presence of a seniority system is merely "a factor in the undue hardship analysis." 228 F. 3d 1105, 1120 (2000). And it held that "[a] case-by-case fact intensive analysis is required to determine whether any particular reassignment would constitute an undue hardship to the employer." *Ibid.*

US Airways petitioned for certiorari, asking us to decide whether

> "the [ADA] requires an employer to reassign a disabled employee to a position as a 'reasonable accommodation'

even though another employee is entitled to hold the position under the employer's bona fide and established seniority system." Brief for Petitioner i.

The Circuits have reached different conclusions about the legal significance of a seniority system. Compare 228 F. 3d, at 1120, with *EEOC* v. *Sara Lee Corp.*, 237 F. 3d 349, 354 (CA4 2001). We agreed to answer US Airways' question.

## II

In answering the question presented, we must consider the following statutory provisions. First, the ADA says that an employer may not "discriminate against a qualified individual with a disability." 42 U. S. C. § 12112(a). Second, the ADA says that a "qualified" individual includes "an individual with a disability who, *with* or without *reasonable accommodation,* can perform the essential functions of" the relevant "employment position." § 12111(8) (emphasis added). Third, the ADA says that "discrimination" includes an employer's *"not making reasonable accommodations* to the known physical or mental limitations of an otherwise qualified . . . employee, *unless* [the employer] can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business." § 12112(b)(5)(A) (emphasis added). Fourth, the ADA says that the term "'reasonable accommodation' may include . . . reassignment to a vacant position." § 12111(9)(B).

The parties interpret this statutory language as applied to seniority systems in radically different ways. In US Airways' view, the fact that an accommodation would violate the rules of a seniority system always shows that the accommodation is not a "reasonable" one. In Barnett's polar opposite view, a seniority system violation never shows that an accommodation sought is not a "reasonable" one. Barnett concedes that a violation of seniority rules might help to show that the accommodation will work "undue" employer "hardship," but that is a matter for an employer to demonstrate

case by case. We shall initially consider the parties' main legal arguments in support of these conflicting positions.

## A

US Airways' claim that a seniority system virtually always trumps a conflicting accommodation demand rests primarily upon its view of how the Act treats workplace "preferences." Insofar as a requested accommodation violates a disability-neutral workplace rule, such as a seniority rule, it grants the employee with a disability treatment that other workers could not receive. Yet the Act, US Airways says, seeks only "equal" treatment for those with disabilities. See, e. g., 42 U. S. C. § 12101(a)(9). It does not, it contends, require an employer to grant preferential treatment. Cf. H. R. Rep. No. 101–485, pt. 2, p. 66 (1990); S. Rep. No. 101–116, pp. 26–27 (1989) (employer has no "obligation to prefer *applicants* with disabilities over other *applicants*" (emphasis added)). Hence it does not require the employer to grant a request that, in violating a disability-neutral rule, would provide a preference.

While linguistically logical, this argument fails to recognize what the Act specifies, namely, that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, i. e., preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.

Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective. Neutral office assignment rules would automatically prevent the ac-

commodation of an employee whose disability-imposed limitations require him to work on the ground floor. Neutral "break-from-work" rules would automatically prevent the accommodation of an individual who needs additional breaks from work, perhaps to permit medical visits. Neutral furniture budget rules would automatically prevent the accommodation of an individual who needs a different kind of chair or desk. Many employers will have neutral rules governing the kinds of actions most needed to reasonably accommodate a worker with a disability. See 42 U. S. C. § 12111(9)(b) (setting forth examples such as "job restructuring," "part-time or modified work schedules," "acquisition or modification of equipment or devices," "and other similar accommodations"). Yet Congress, while providing such examples, said nothing suggesting that the presence of such neutral rules would create an automatic exemption. Nor have the lower courts made any such suggestion. Cf. *Garcia-Ayala* v. *Lederle Parenterals, Inc.*, 212 F. 3d 638, 648 (CA1 2000) (requiring leave beyond that allowed under the company's own leave policy); *Hendricks-Robinson* v. *Excel Corp.*, 154 F. 3d 685, 699 (CA7 1998) (requiring exception to employer's neutral "physical fitness" job requirement).

In sum, the nature of the "reasonable accommodation" requirement, the statutory examples, and the Act's silence about the exempting effect of neutral rules together convince us that the Act does not create any such automatic exemption. The simple fact that an accommodation would provide a "preference"—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, *in and of itself,* automatically show that the accommodation is not "reasonable." As a result, we reject the position taken by US Airways and JUSTICE SCALIA to the contrary.

US Airways also points to the ADA provisions stating that a " 'reasonable accommodation' may include . . . reassignment to a *vacant* position." § 12111(9)(B) (emphasis added). And

it claims that the fact that an established seniority system would assign that position to another worker automatically and always means that the position is not a "vacant" one. Nothing in the Act, however, suggests that Congress intended the word "vacant" to have a specialized meaning. And in ordinary English, a seniority system can give employees seniority rights allowing them to bid for a "vacant" position. The position in this case was held, at the time of suit, by Barnett, not by some other worker; and that position, under the US Airways seniority system, became an "open" one. Brief for Petitioner 5. Moreover, US Airways has said that it "reserves the right to change any and all" portions of the seniority system at will. Lodging of Respondent 2 (US Air Personnel Policy Guide for Agents). Consequently, we cannot agree with US Airways about the position's vacancy; nor do we agree that the Act would automatically deny Barnett's accommodation request for that reason.

## B

Barnett argues that the statutory words "reasonable accommodation" mean only "effective accommodation," authorizing a court to consider the requested accommodation's ability to meet an individual's disability-related needs, and nothing more. On this view, a seniority rule violation, having nothing to do with the accommodation's effectiveness, has nothing to do with its "reasonableness." It might, at most, help to prove an "undue hardship on the operation of the business." But, he adds, that is a matter that the statute requires the employer to demonstrate, case by case.

In support of this interpretation Barnett points to Equal Employment Opportunity Commission (EEOC) regulations stating that "reasonable accommodation means . . . . [m]odifications or adjustments . . . that *enable* a qualified individual with a disability to perform the essential functions of [a] position." 29 CFR § 1630(o)(ii) (2001) (emphasis added). See also H. R. Rep. No. 101–485, pt. 2, at 66; S. Rep. No. 101–116,

at 35 (discussing reasonable accommodations in terms of "effectiveness," while discussing costs in terms of "undue hardship"). Barnett adds that any other view would make the words "reasonable accommodation" and "undue hardship" virtual mirror images—creating redundancy in the statute. And he says that any such other view would create a practical burden of proof dilemma.

The practical burden of proof dilemma arises, Barnett argues, because the statute imposes the burden of demonstrating an "undue hardship" upon the employer, while the burden of proving "reasonable accommodation" remains with the plaintiff, here the employee. This allocation seems sensible in that an employer can more frequently and easily prove the presence of business hardship than an employee can prove its absence. But suppose that an employee must counter a claim of "seniority rule violation" in order to prove that an "accommodation" request is "reasonable." Would that not force the employee to prove what is in effect an absence, *i. e.*, an absence of hardship, despite the statute's insistence that the employer "demonstrate" hardship's presence?

These arguments do not persuade us that Barnett's legal interpretation of "reasonable" is correct. For one thing, in ordinary English the word "reasonable" does not mean "effective." It is the word "accommodation," not the word "reasonable," that conveys the need for effectiveness. An *ineffective* "modification" or "adjustment" will not *accommodate* a disabled individual's limitations. Nor does an ordinary English meaning of the term "reasonable accommodation" make of it a simple, redundant mirror image of the term "undue hardship." The statute refers to an "undue hardship on the operation of the business." 42 U. S. C. § 12112(b)(5)(A). Yet a demand for an effective accommodation could prove unreasonable because of its impact, not on business operations, but on fellow employees—say, because it will lead to dismissals, relocations, or modification of em-

ployee benefits to which an employer, looking at the matter from the perspective of the business itself, may be relatively indifferent.

Neither does the statute's primary purpose require Barnett's special reading. The statute seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace. See generally §§ 12101(a) and (b). These objectives demand unprejudiced thought and reasonable responsive reaction on the part of employers and fellow workers alike. They will sometimes require affirmative conduct to promote entry of disabled people into the work force. See *supra*, at 397–398. They do not, however, demand action beyond the realm of the reasonable.

Neither has Congress indicated in the statute, or elsewhere, that the word "reasonable" means no more than "effective." The EEOC regulations do say that reasonable accommodations "enable" a person with a disability to perform the essential functions of a task. But that phrasing simply emphasizes the statutory provision's basic objective. The regulations do not say that "enable" and "reasonable" mean the same thing. And as discussed below, no court of appeals has so read them. But see 228 F. 3d, at 1122–1123 (Gould, J., concurring).

Finally, an ordinary language interpretation of the word "reasonable" does not create the "burden of proof" dilemma to which Barnett points. Many of the lower courts, while rejecting both US Airways' and Barnett's more absolute views, have reconciled the phrases "reasonable accommodation" and "undue hardship" in a practical way.

They have held that a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an "accommodation" seems reasonable on its face, *i. e.*, ordinarily or in the run of cases. See, *e. g.*, *Reed* v. *LePage Bakeries, Inc.*, 244 F. 3d 254, 259 (CA1 2001)

(plaintiff meets burden on reasonableness by showing that, "at least on the face of things," the accommodation will be feasible for the employer); *Borkowski* v. *Valley Central School Dist.*, 63 F. 3d 131, 138 (CA2 1995) (plaintiff satisfies "burden of production" by showing "plausible accommodation"); *Barth* v. *Gelb*, 2 F. 3d 1180, 1187 (CADC 1993) (interpreting parallel language in Rehabilitation Act, stating that plaintiff need only show he seeks a *"method of accommodation* that is reasonable in the run of cases" (emphasis in original)).

Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances. See *Reed, supra,* at 258 ("'undue hardship inquiry focuses on the hardships imposed . . . in the context of the particular [employer's] operations'") (quoting *Barth, supra,* at 1187); *Borkowski, supra,* at 138 (after plaintiff makes initial showing, burden falls on employer to show that particular accommodation "would cause it to suffer an undue hardship"); *Barth, supra,* at 1187 ("undue hardship inquiry focuses on the hardships imposed . . . in the context of the particular agency's operations").

Not every court has used the same language, but their results are functionally similar. In our opinion, that practical view of the statute, applied consistently with ordinary summary judgment principles, see Fed. Rule Civ. Proc. 56, avoids Barnett's burden of proof dilemma, while reconciling the two statutory phrases ("reasonable accommodation" and "undue hardship").

## III

The question in the present case focuses on the relationship between seniority systems and the plaintiff's need to show that an "accommodation" seems reasonable on its face, *i. e.,* ordinarily or in the run of cases. We must assume that the plaintiff, an employee, is an "individual with a disability." He has requested assignment to a mailroom position as a

"reasonable accommodation." We also assume that normally such a request would be reasonable within the meaning of the statute, were it not for one circumstance, namely, that the assignment would violate the rules of a seniority system. See § 12111(9) ("reasonable accommodation" may include "reassignment to a vacant position"). Does that circumstance mean that the proposed accommodation is not a "reasonable" one?

In our view, the answer to this question ordinarily is "yes." The statute does not require proof on a case-by-case basis that a seniority system should prevail. That is because it would not be reasonable in the run of cases that the assignment in question trump the rules of a seniority system. To the contrary, it will ordinarily be unreasonable for the assignment to prevail.

### A

Several factors support our conclusion that a proposed accommodation will not be reasonable in the run of cases. Analogous case law supports this conclusion, for it has recognized the importance of seniority to employee-management relations. This Court has held that, in the context of a Title VII religious discrimination case, an employer need not adapt to an employee's special worship schedule as a "reasonable accommodation" where doing so would conflict with the seniority rights of other employees. *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 79–80 (1977). The lower courts have unanimously found that collectively bargained seniority trumps the need for reasonable accommodation in the context of the linguistically similar Rehabilitation Act. See *Eckles* v. *Consolidated Rail Corp.*, 94 F. 3d 1041, 1047–1048 (CA7 1996) (collecting cases); *Shea* v. *Tisch*, 870 F. 2d 786, 790 (CA1 1989); *Carter* v. *Tisch*, 822 F. 2d 465, 469 (CA4 1987); *Jasany* v. *United States Postal Service*, 755 F. 2d 1244, 1251–1252 (CA6 1985). And several Circuits, though differing in their reasoning, have reached a similar conclusion in the context of seniority and the ADA. See *Smith* v. *Mid-*

*land Brake, Inc.*, 180 F. 3d 1154, 1175 (CA10 1999); *Feliciano* v. *Rhode Island*, 160 F. 3d 780, 787 (CA1 1998); *Eckles, supra*, at 1047–1048. All these cases discuss *collectively bargained* seniority systems, not systems (like the present system) which are unilaterally imposed by management. But the relevant seniority system advantages, and related difficulties that result from violations of seniority rules, are not limited to collectively bargained systems.

For one thing, the typical seniority system provides important employee benefits by creating, and fulfilling, employee expectations of fair, uniform treatment. These benefits include "job security and an opportunity for steady and predictable advancement based on objective standards." Brief for Petitioner 32 (citing Fallon & Weiler, Firefighters v. Stotts: Conflicting Models of Racial Justice, 1984 S. Ct. Rev. 1, 57–58). See also 1 B. Lindemann & P. Grossman, Employment Discrimination Law 72 (3d ed. 1996) ("One of the most important aspects of competitive seniority is its use in determining who will be laid off during a reduction in force"). They include "an element of due process," limiting "unfairness in personnel decisions." Gersuny, Origins of Seniority Provisions in Collective Bargaining, 33 Lab. L. J. 518, 519 (1982). And they consequently encourage employees to invest in the employing company, accepting "less than their value to the firm early in their careers" in return for greater benefits in later years. J. Baron & D. Kreps, Strategic Human Resources: Frameworks for General Managers 288 (1999).

Most important for present purposes, to require the typical employer to show more than the existence of a seniority system might well undermine the employees' expectations of consistent, uniform treatment—expectations upon which the seniority system's benefits depend. That is because such a rule would substitute a complex case-specific "accommodation" decision made by management for the more uniform, impersonal operation of seniority rules. Such management

decisionmaking, with its inevitable discretionary elements, would involve a matter of the greatest importance to employees, namely, layoffs; it would take place outside, as well as inside, the confines of a court case; and it might well take place fairly often. Cf. ADA, 42 U. S. C. § 12101(a)(1) (estimating that some 43 million Americans suffer from physical or mental disabilities). We can find nothing in the statute that suggests Congress intended to undermine seniority systems in this way. And we consequently conclude that the employer's showing of violation of the rules of a seniority system is by itself ordinarily sufficient.

## B

The plaintiff (here the employee) nonetheless remains free to show that special circumstances warrant a finding that, despite the presence of a seniority system (which the ADA may not trump in the run of cases), the requested "accommodation" is "reasonable" on the particular facts. That is because special circumstances might alter the important expectations described above. Cf. *Borkowski*, 63 F. 3d, at 137 ("[A]n accommodation that imposed burdens that would be unreasonable for most members of an industry might nevertheless be required of an individual defendant in light of that employer's particular circumstances"). See also *Woodman* v. *Runyon*, 132 F. 3d 1330, 1343–1344 (CA10 1997). The plaintiff might show, for example, that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be followed—to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference. The plaintiff might show that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter. We do not mean these examples to exhaust the kinds of showings that a plaintiff might make. But we do mean to say that the plaintiff must bear

the burden of showing special circumstances that make an exception from the seniority system reasonable in the particular case. And to do so, the plaintiff must explain why, in the particular case, an exception to the employer's seniority policy can constitute a "reasonable accommodation" even though in the ordinary case it cannot.

## IV

In its question presented, US Airways asked us whether the ADA requires an employer to assign a disabled employee to a particular position even though another employee is entitled to that position under the employer's "established seniority system." We answer that *ordinarily* the ADA does not require that assignment. Hence, a showing that the assignment would violate the rules of a seniority system warrants summary judgment for the employer—unless there is more. The plaintiff must present evidence of that "more," namely, special circumstances surrounding the particular case that demonstrate the assignment is nonetheless reasonable.

Because the lower courts took a different view of the matter, and because neither party has had an opportunity to seek summary judgment in accordance with the principles we set forth here, we vacate the Court of Appeals' judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

While I join the Court's opinion, my colleagues' separate writings prompt these additional comments.

A possible conflict with an employer's seniority system is relevant to the question whether a disabled employee's requested accommodation is "reasonable" within the meaning of the Americans with Disabilities Act of 1990. For that

reason, to the extent that the Court of Appeals concluded that a seniority system is only relevant to the question whether a given accommodation would impose an "undue hardship" on an employer, or determined that such a system has only a minor bearing on the reasonableness inquiry, it misread the statute.

Although the Court of Appeals did not apply the standard that the Court endorses today, it correctly rejected the *per se* rule that petitioner has pressed upon us and properly reversed the District Court's entry of summary judgment for petitioner. The Court of Appeals also correctly held that there was a triable issue of fact precluding the entry of summary judgment with respect to whether petitioner violated the statute by failing to engage in an interactive process concerning respondent's three proposed accommodations. 228 F. 3d 1105, 1117 (CA9 2000) (en banc). This latter holding is untouched by the Court's opinion today.

Among the questions that I have not been able to answer on the basis of the limited record that has been presented to us are: (1) whether the mailroom position held by respondent became open for bidding merely in response to a routine airline schedule change,[1] or as the direct consequence of the layoff of several thousand employees;[2] (2) whether respondent's requested accommodation should be viewed as an assignment to a vacant position,[3] or as the maintenance of the status quo;[4] and (3) exactly what impact the grant of respondent's request would have had on other employees.[5]

---

[1] Brief for Respondent 3 (quoting Lodging of Respondent 7–8 (letter, dated Mar. 8, 1994, from petitioner's counsel to Equal Employment Opportunity Commission)).

[2] Brief for Petitioner 5 (citing App. 21 (declaration in support of petitioner's summary judgment motion)).

[3] See *post,* at 409–410 (O'CONNOR, J., concurring).

[4] See *post,* at 423 (SOUTER, J., dissenting).

[5] See, *e. g., ibid.* ("There was no evidence in the District Court of any unmanageable ripple effects from Barnett's request").

As I understand the Court's opinion, on remand, respondent will have the burden of answering these and other questions in order to overcome the presumption that petitioner's seniority system justified respondent's discharge.

JUSTICE O'CONNOR, concurring.

I agree with portions of the opinion of the Court, but I find problematic the Court's test for determining whether the fact that a job reassignment violates a seniority system makes the reassignment an unreasonable accommodation under the Americans with Disabilities Act of 1990 (ADA or Act), 42 U. S. C. § 12101 *et seq.* (1994 ed. and Supp. V). Although a seniority system plays an important role in the workplace, for the reasons I explain below, I would prefer to say that the effect of a seniority system on the reasonableness of a reassignment as an accommodation for purposes of the ADA depends on whether the seniority system is legally enforceable. "Were it possible for me to adhere to [this belief] in my vote, and for the Court at the same time to [adopt a majority rule]," I would do so. *Screws* v. *United States*, 325 U. S. 91, 134 (1945) (Rutledge, J., concurring in result). "The Court, however, is divided in opinion," *ibid.*, and if each Member voted consistently with his or her beliefs, we would not agree on a resolution of the question presented in this case. Yet "[s]talemate should not prevail," *ibid.*, particularly in a case in which we are merely interpreting a statute. Accordingly, in order that the Court may adopt a rule, and because I believe the Court's rule will often lead to the same outcome as the one I would have adopted, I join the Court's opinion despite my concerns. Cf. *Bragdon* v. *Abbott*, 524 U. S. 624, 655–656 (1998) (STEVENS, J., joined by BREYER, J., concurring); *Olmstead* v. *L. C.*, 527 U. S. 581, 607–608 (1999) (STEVENS, J., concurring in part and concurring in judgment).

The ADA specifically lists "reassignment to a vacant position" as one example of a "reasonable accommodation." 42

U. S. C. § 12111(9)(B) (1994 ed.). In deciding whether an otherwise reasonable accommodation involving a reassignment is unreasonable because it would require an exception to a seniority system, I think the relevant issue is whether the seniority system prevents the position in question from being vacant. The word "vacant" means "not filled or occupied by an incumbent [or] possessor." Webster's Third New International Dictionary 2527 (1976). In the context of a workplace, a vacant position is a position in which no employee currently works and to which no individual has a legal entitlement. For example, in a workplace without a seniority system, when an employee ceases working for the employer, the employee's former position is vacant until a replacement is hired. Even if the replacement does not start work immediately, once the replacement enters into a contractual agreement with the employer, the position is no longer vacant because it has a "possessor." In contrast, when an employee ceases working in a workplace with a legally enforceable seniority system, the employee's former position does not become vacant if the seniority system entitles another employee to it. Instead, the employee entitled to the position under the seniority system immediately becomes the new "possessor" of that position. In a workplace with an unenforceable seniority policy, however, an employee expecting assignment to a position under the seniority policy would not have any type of contractual right to the position and so could not be said to be its "possessor." The position therefore would become vacant.

Given this understanding of when a position can properly be considered vacant, if a seniority system, in the absence of the ADA, would give someone other than the individual seeking the accommodation a legal entitlement or contractual right to the position to which reassignment is sought, the seniority system prevents the position from being vacant. If a position is not vacant, then reassignment to it is not a reasonable accommodation. The Act specifi-

cally says that "reassignment to a *vacant* position" is a type of "reasonable accommodation." § 12111(9)(B) (emphasis added). Indeed, the legislative history of the Act confirms that Congress did not intend reasonable accommodation to require bumping other employees. H. R. Rep. No. 101–485, pt. 2, p. 63 (1990) ("The Committee also wishes to make clear that reassignment need only be to a vacant position—'bumping' another employee out of a position to create a vacancy is not required"); S. Rep. No. 101–116, p. 32 (1989) (same).

Petitioner's Personnel Policy Guide for Agents, which contains its seniority policy, specifically states that it is "*not* intended to be a contract (express or implied) or otherwise to create legally enforceable obligations," and that petitioner "reserves the right to change any and all of the stated policies and procedures in [the] Guide at any time, without advanc[e] notice." Lodging of Respondent 2 (emphasis in original). Petitioner conceded at oral argument that its seniority policy does not give employees any legally enforceable rights. Tr. of Oral Arg. 16. Because the policy did not give any other employee a right to the position respondent sought, the position could be said to have been vacant when it became open for bidding, making the requested accommodation reasonable.

In Part II of its opinion, the Court correctly explains that "a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face, *i. e.,* ordinarily or in the run of cases." *Ante,* at 401. In other words, the plaintiff must show that the method of accommodation the employee seeks is reasonable in the run of cases. See *ante,* at 402 (quoting *Barth* v. *Gelb,* 2 F. 3d 1180, 1187 (CADC 1993)). As the Court also correctly explains, "[o]nce the plaintiff has made this showing, the defendant/employer then must show special . . . circumstances that demonstrate undue hardship" in the context of the particular employer's operations. *Ante,* at 402. These interpretations give ap-

propriate meaning to both the term "reasonable," 42 U. S. C. § 12112(b)(5)(A), and the term "undue hardship," *ibid.*, preventing the concepts from overlapping by making reasonableness a general inquiry and undue hardship a specific inquiry. When the Court turns to applying its interpretation of the Act to seniority systems, however, it seems to blend the two inquiries by suggesting that the plaintiff should have the opportunity to prove that there are special circumstances in the context of that particular seniority system that would cause an exception to the system to be reasonable despite the fact that such exceptions are unreasonable in the run of cases.

Although I am troubled by the Court's reasoning, I believe the Court's approach for evaluating seniority systems will often lead to the same outcome as the test I would have adopted. Unenforceable seniority systems are likely to involve policies in which employers "retai[n] the right to change the seniority system," *ante*, at 405, and will often "contai[n] exceptions," *ibid.* They will also often contain disclaimers that "reduc[e] employee expectations that the system will be followed." *Ibid.* Thus, under the Court's test, disabled employees seeking accommodations that would require exceptions to unenforceable seniority systems may be able to show circumstances that make the accommodation "reasonable in the[ir] particular case." *Ante*, at 406. Because I think the Court's test will often lead to the correct outcome, and because I think it important that a majority of the Court agree on a rule when interpreting statutes, I join the Court's opinion.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

The question presented asks whether the "reasonable accommodation" mandate of the Americans with Disabilities Act of 1990 (ADA or Act) requires reassignment of a disabled employee to a position that "another employee is entitled

to hold . . . under the employer's bona fide and established seniority system." Pet. for Cert. i; 532 U. S. 970 (2001). Indulging its penchant for eschewing clear rules that might avoid litigation, see, *e. g., Kansas* v. *Crane,* 534 U. S. 407, 423 (2002) (SCALIA, J., dissenting); *TRW Inc.* v. *Andrews,* 534 U. S. 19, 35–36 (2001) (SCALIA, J., concurring in judgment), the Court answers "maybe." It creates a presumption that an exception to a seniority rule is an "unreasonable" accommodation, *ante,* at 403, but allows that presumption to be rebutted by showing that the exception "will not likely make a difference," *ante,* at 405.

The principal defect of today's opinion, however, goes well beyond the uncertainty it produces regarding the relationship between the ADA and the infinite variety of seniority systems. The conclusion that any seniority system can ever be overridden is merely one consequence of a mistaken interpretation of the ADA that makes all employment rules and practices—even those which (like a seniority system) pose no *distinctive* obstacle to the disabled—subject to suspension when that is (in a court's view) a "reasonable" means of enabling a disabled employee to keep his job. That is a far cry from what I believe the accommodation provision of the ADA requires: the suspension (within reason) of those employment rules and practices *that the employee's disability prevents him from observing.*

## I

The Court begins its analysis by describing the ADA as declaring that an employer may not " 'discriminate against a qualified individual with a disability.' " *Ante,* at 396 (quoting 42 U. S. C. § 12112(a) (1994 ed.)). In fact the Act says more: an employer may not "discriminate against a qualified individual with a disability *because of the disability* of such individual." 42 U. S. C. § 12112(a) (1994 ed.) (emphasis added). It further provides that discrimination includes "not making reasonable accommodations *to the known physi-*

*cal or mental limitations* of an otherwise qualified individual with a disability." § 12112(b)(5)(A) (emphasis added).

Read together, these provisions order employers to modify or remove (within reason) policies and practices that burden a disabled person "because of [his] disability." In other words, the ADA eliminates workplace barriers only if a disability prevents an employee from overcoming them—those barriers that would not be barriers *but for* the employee's disability. These include, for example, work stations that cannot accept the employee's wheelchair, or an assembly-line practice that requires long periods of standing. But they do not include rules and practices that bear no more heavily upon the disabled employee than upon others—even though an exemption from such a rule or practice might in a sense "make up for" the employee's disability. It is not a required accommodation, for example, to pay a disabled employee more than others at his grade level—even if that increment is earmarked for massage or physical therapy that would enable the employee to work with as little physical discomfort as his co-workers. That would be "accommodating" the disabled employee, but it would not be "making . . . accommodatio[n] *to the known physical or mental limitations*" of the employee, § 12112(b)(5)(A), because it would not eliminate any workplace practice that constitutes an obstacle *because of* his disability.

So also with exemption from a seniority system, which burdens the disabled and nondisabled alike. In particular cases, seniority rules may have a harsher effect upon the disabled employee than upon his co-workers. If the disabled employee is physically capable of performing only one task in the workplace, seniority rules may be, for him, the difference between employment and unemployment. But that does not make the seniority system a disability-related obstacle, any more than harsher impact upon the more needy disabled employee renders the salary system a disability-related obstacle. When one departs from this understanding, the

ADA's accommodation provision becomes a standardless grab bag—leaving it to the courts to decide which workplace preferences (higher salary, longer vacations, reassignment to positions to which others are entitled) can be deemed "reasonable" to "make up for" the particular employee's disability.

Some courts, including the Ninth Circuit in the present case, have accepted respondent's contention that the ADA demands accommodation even with respect to those obstacles that have nothing to do with the disability. Their principal basis for this position is that the definition of "reasonable accommodation" includes "reassignment to a vacant position." § 12111(9)(B). This accommodation would be meaningless, they contend, if it required only that the disabled employee be *considered* for a vacant position. The ADA already prohibits employers from discriminating against the disabled with respect to "hiring, advancement, or discharge . . . and other terms, conditions, and privileges of employment." § 12112(a). Surely, the argument goes, a disabled employee must be given preference over a nondisabled employee when a vacant position appears. See *Smith* v. *Midland Brake, Inc.*, 180 F. 3d 1154, 1164–1165 (CA10 1999) (en banc); *Aka* v. *Washington Hospital Center,* 156 F. 3d 1284, 1304–1305 (CADC 1998) (en banc). Accord, EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 3 BNA EEOC Compliance Manual, No. 246, p. N:2479 (Mar. 1, 1999).

This argument seems to me quite mistaken. The right to be given a vacant position so long as there are no obstacles to that appointment (including another candidate who is better qualified, if "best qualified" is the workplace rule) is of considerable value. If an employee is hired to fill a position but fails miserably, he will typically be fired. Few employers will search their organization charts for vacancies

to which the low-performing employee might be suited. The ADA, however, prohibits an employer from firing a person whose disability is the cause of his poor performance without first seeking to place him in a vacant job where the disability will not affect performance. Such reassignment is an accommodation *to the disability* because it removes an obstacle (the inability to perform the functions of the assigned job) arising solely from the disability. Cf. *Bruff* v. *North Mississippi Health Services, Inc.*, 244 F. 3d 495, 502 (CA5 2001). See also 3 BNA EEOC Compliance Manual, *supra*, at N:2478 ("[A]n employer who does not normally transfer employees would still have to reassign an employee with a disability").

The phrase "reassignment to a vacant position" appears in a subsection describing a variety of potential "reasonable accommodation[s]":

> "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> "(B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position,* acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." § 12111(9) (emphasis added).

Subsection (A) clearly addresses features of the workplace that burden the disabled *because of* their disabilities. Subsection (B) is broader in scope but equally targeted at disability-related obstacles. Thus it encompasses "modified work schedules" (which may accommodate inability to work for protracted periods), "modification of equipment and devices," and "provision of qualified readers or interpreters."

There is no reason why the phrase "reassignment to a vacant position" should be thought to have a uniquely different focus. It envisions elimination of the obstacle of the *current position* (which requires activity that the disabled employee cannot tolerate) when there is an alternate position freely available. If he is qualified for that position, and no one else is seeking it, or no one else who seeks it is better qualified, he *must* be given the position. But "reassignment to a vacant position" does *not* envision the elimination of obstacles to the employee's service in the new position that have nothing to do with his disability—for example, another employee's claim to that position under a seniority system, or another employee's superior qualifications. Cf. 29 CFR pt. 1630, App. § 1630.2(o), p. 357 (2001) (explaining "reasonable accommodation" as "any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy *equal employment opportunities*" (emphasis added)); *Aka* v. *Washington Hospital Center, supra,* at 1314–1315 (Silberman, J., dissenting) (interpreting "reassignment to a vacant position" consistently with the other accommodations listed in § 12111(9), none of which "even alludes to the possibility of a preference for the disabled over the nondisabled").

Unsurprisingly, most Courts of Appeals addressing the issue have held or assumed that the ADA does not mandate exceptions to a "legitimate, nondiscriminatory policy" such as a seniority system or a consistent policy of assigning the most qualified person to a vacant position. See, *e. g., EEOC* v. *Sara Lee Corp.,* 237 F. 3d 349, 353–355 (CA4 2001) (seniority system); *EEOC* v. *Humiston-Keeling, Inc.,* 227 F. 3d 1024, 1028–1029 (CA7 2000) (policy of assigning the most qualified applicant); *Burns* v. *Coca-Cola Enterprises, Inc.,* 222 F. 3d 247, 257–258 (CA6 2000) (policy of reassigning employees only if they request a transfer to an advertised vacant position); *Cravens* v. *Blue Cross and Blue Shield of Kansas City,*

214 F. 3d 1011, 1020 (CA8 2000) (assuming reassignment is not required if it would violate legitimate, nondiscriminatory policies); *Duckett* v. *Dunlop Tire Corp.*, 120 F. 3d 1222, 1225 (CA11 1997) (policy of not reassigning salaried workers to production positions covered by a collective-bargaining unit); *Daugherty* v. *El Paso*, 56 F. 3d 695, 700 (CA5 1995) (policy of giving full-time employees priority over part-time employees in assigning vacant positions).

Even the Equal Employment Opportunity Commission, in at least some of its regulations, acknowledges that the ADA clears away only obstacles *arising from* a person's disability and nothing more. According to the agency, the term "reasonable accommodation" means

> "(i) [m]odifications or adjustments to a job application process *that enable* a qualified applicant with a disability *to be considered for* the position such qualified applicant desires; or
>
> "(ii) [m]odifications or adjustments to the work environment . . . *that enable* a qualified individual with a disability to perform the essential functions of that position; or
>
> "(iii) [m]odifications or adjustments *that enable* a covered entity's employee with a disability *to enjoy equal benefits and privileges* of employment as are enjoyed by its other similarly situated employees without disabilities." 29 CFR § 1630.2(o) (2001) (emphasis added).

See also 29 CFR pt. 1630, App. § 1630.9, at 364 ("reasonable accommodation requirement is best understood as a means by which barriers to . . . equal employment opportunity . . . are removed or alleviated").

Sadly, this analysis is lost on the Court, which mistakenly and inexplicably concludes, *ante*, at 398, that my position here is the same as that attributed to US Airways. In rejecting the argument that the ADA creates no "automatic exemption" for neutral workplace rules such as "break-

from-work" and furniture budget rules, *ante*, at 397–398, the Court rejects an argument I have not made.

## II

Although, as I have said, the uncertainty cast upon bona fide seniority systems is the least of the ill consequences produced by today's decision, a few words on that subject are nonetheless in order. Since, under the Court's interpretation of the ADA, *all* workplace rules are eligible to be used as vehicles of accommodation, the one means of saving seniority systems is a judicial finding that accommodation through the suspension of *those* workplace rules would be unreasonable. The Court is unwilling, however, to make that finding categorically, with respect to all seniority systems. Instead, it creates (and "creates" is the appropriate word) a *rebuttable presumption* that exceptions to seniority rules are not "reasonable" under the ADA, but leaves it free for the disabled employee to show that *under the "special circumstances" of his case,* an exception would be "reasonable." *Ante,* at 405. The employee would be entitled to an exception, for example, if he showed that "one more departure" from the seniority rules "will not likely make a difference." *Ibid.*

I have no idea what this means. When is it possible for a departure from seniority rules to "not likely make a difference"? Even when a bona fide seniority system has multiple exceptions, employees expect that these are the *only* exceptions. One more unannounced exception will invariably undermine the values ("fair, uniform treatment," "job security," "predictable advancement," etc.) that the Court cites as its reasons for believing seniority systems so important that they merit a presumption of exemption. See *ante,* at 404.

One is tempted to impart some rationality to the scheme by speculating that the Court's burden-shifting rule is

merely intended to give the disabled employee an opportunity to show that the employer's seniority system is in fact a sham—a system so full of exceptions that it creates no meaningful employee expectations. The rule applies, however, even if the seniority system is "bona fide and established," Pet. for Cert. i. And the Court says that "to require the typical employer to show more than the existence of a seniority system might well undermine the employees' expectations of consistent, uniform treatment . . . ." *Ante*, at 404. How could deviations from a sham seniority system "undermine the employees' expectations"?

I must conclude, then, that the Court's rebuttable presumption does not merely give disabled employees the opportunity to unmask sham seniority systems; it gives them a vague and unspecified power (whenever they can show "special circumstances") to undercut *bona fide* systems. The Court claims that its new test will not require exceptions to seniority systems "in the run of cases," *ante*, at 403, but that is belied by the disposition of this case. The Court remands to give respondent an opportunity to show that an exception to petitioner's seniority system "will not likely make a difference" to employee expectations, *ante*, at 405, despite the following finding by the District Court:

> "[T]he uncontroverted evidence shows that [petitioner's] seniority system has been in place for 'decades' and governs over 14,000 . . . Agents. Moreover, seniority policies such as the one at issue in this case are common to the airline industry. Given this context, it seems clear that [petitioner's] employees were justified in relying upon the policy. As such, any significant alteration of that policy would result in undue hardship to both the company and its non-disabled employees." App. to Pet. for Cert. 96a.

\* \* \*

Because the Court's opinion leaves the question whether a seniority system must be disregarded in order to accommodate a disabled employee in a state of uncertainty that can be resolved only by constant litigation; and because it adopts an interpretation of the ADA that incorrectly subjects all employer rules and practices to the requirement of reasonable accommodation; I respectfully dissent.

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, dissenting.

"[R]eassignment to a vacant position," 42 U. S. C. § 12111(9) (1994 ed.), is one way an employer may "reasonabl[y] accommodat[e]" disabled employees under the Americans with Disabilities Act of 1990 (ADA), 42 U. S. C. § 12101 *et seq.* (1994 ed. and Supp. V). The Court today holds that a request for reassignment will nonetheless most likely be unreasonable when it would violate the terms of a seniority system imposed by an employer. Although I concur in the Court's appreciation of the value and importance of seniority systems, I do not believe my hand is free to accept the majority's result and therefore respectfully dissent.

Nothing in the ADA insulates seniority rules from the "reasonable accommodation" requirement, in marked contrast to Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967, each of which has an explicit protection for seniority. See 42 U. S. C. § 2000e–2(h) (1994 ed.) ("Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to [provide different benefits to employees] pursuant to a bona fide seniority . . . system . . ."); 29 U. S. C. § 623(f) (1994 ed.) ("It shall not be unlawful for an employer . . . to take any action otherwise prohibited [under previous sections] . . . to observe the terms of a bona fide seniority system [except for involuntary retirement] . . ."). Because Congress modeled several of the

ADA's provisions on Title VII,[1] its failure to replicate Title VII's exemption for seniority systems leaves the statute ambiguous, albeit with more than a hint that seniority rules do not inevitably carry the day.

In any event, the statute's legislative history resolves the ambiguity. The Committee Reports from both the House of Representatives and the Senate explain that seniority protections contained in a collective-bargaining agreement should not amount to more than "a factor" when it comes to deciding whether some accommodation at odds with the seniority rules is "reasonable" nevertheless. H. R. Rep. No. 101–485, pt. 2, p. 63 (1990) (existence of collectively bargained protections for seniority "would not be determinative" on the issue whether an accommodation was reasonable); S. Rep. No. 101–116, p. 32 (1989) (a collective-bargaining agreement assigning jobs based on seniority "may be considered as a factor in determining" whether an accommodation is reasonable). Here, of course, it does not matter whether the congressional committees were right or wrong in thinking that views of sound ADA application could reduce a collectively bargained seniority policy to the level of "a factor," in the absence of a specific statutory provision to that effect. In fact, I doubt that any interpretive clue in legislative history could trump settled law specifically making collective-bargaining agreements enforceable. See, e. g., § 301(a), Labor Management Relations Act, 1947, 29 U. S. C. § 185(a) (permitting suit in federal court to enforce collective-bargaining agreements); *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448 (1957) (holding that § 301(a) expresses a federal policy in favor of the enforceability of labor contracts); *Charles Dowd Box Co.* v. *Courtney*, 368 U. S.

---

[1] It is evident from the legislative history that several provisions of Title VII were copied or incorporated by reference into the ADA. See, e. g., S. Rep. No. 101–116, pp. 2, 25, 43 (1989); H. R. Rep. No. 101–485, pt. 2, pp. 54, 76–77 (1990).

502, 509 (1962) ("Section 301(a) reflects congressional recognition of the vital importance of assuring the enforceability of [collective-bargaining] agreements"). The point in this case, however, is simply to recognize that if Congress considered that sort of agreement no more than a factor in the analysis, surely no greater weight was meant for a seniority scheme like the one before us, unilaterally imposed by the employer, and, unlike collective-bargaining agreements, not singled out for protection by any positive federal statute.

This legislative history also specifically rules out the majority's reliance on *Trans World Airlines, Inc.* v. *Hardison,* 432 U. S. 63 (1977), *ante,* at 403, a case involving a request for a religious accommodation under Title VII that would have broken the seniority rules of a collective-bargaining agreement. We held that such an accommodation would not be "reasonable," and said that our conclusion was "supported" by Title VII's explicit exemption for seniority systems. 432 U. S., at 79–82. The committees of both Houses of Congress dealing with the ADA were aware of this case and expressed a choice against treating it as authority under the ADA, with its lack of any provision for maintaining seniority rules. *E. g.,* H. R. Rep. No. 101–485, pt. 2, at 68 ("The Committee wishes to make it clear that the principles enunciated by the Supreme Court in *TWA* v. *Hardison . . .* are not applicable to this legislation"); S. Rep. No. 101–116, at 36 (same).[2]

---

[2] The House Report singles out *Hardison*'s equation of "undue hardship" and anything more than a "de minimus *[sic]* cost" as being inapplicable to the ADA. By contrast, *Hardison* itself addressed seniority systems not only in its analysis of undue hardship, but also in its analysis of reasonable accommodation. 432 U. S., at 81, 84. Nonetheless, Congress's disavowal of *Hardison* in light of the "crucial role that reasonable accommodation plays in ensuring meaningful employment opportunities for people with disabilities," H. R. Rep. No. 101–485, pt. 2, at 68, renders that case singularly inappropriate to bolster the Court's holding today.

Because a unilaterally imposed seniority system enjoys no special protection under the ADA, a consideration of facts peculiar to this very case is needed to gauge whether Barnett has carried the burden of showing his proposed accommodation to be a "reasonable" one despite the policy in force at US Airways. The majority describes this as a burden to show the accommodation is "plausible" or "feasible," *ante*, at 402, and I believe Barnett has met it.

He held the mailroom job for two years before learning that employees with greater seniority planned to bid for the position, given US Airways's decision to declare the job "vacant." Thus, perhaps unlike ADA claimants who request accommodation through reassignment, Barnett was seeking not a change but a continuation of the status quo. All he asked was that US Airways refrain from declaring the position "vacant"; he did not ask to bump any other employee and no one would have lost a job on his account. There was no evidence in the District Court of any unmanageable ripple effects from Barnett's request, or showing that he would have overstepped an inordinate number of seniority levels by remaining where he was.

In fact, it is hard to see the seniority scheme here as any match for Barnett's ADA requests, since US Airways apparently took pains to ensure that its seniority rules raised no great expectations. In its policy statement, US Airways said that "[t]he Agent Personnel Policy Guide is *not* intended to be a contract" and that "USAir reserves the right to change any and all of the stated policies and procedures in this Guide at any time, without advanced notice." Lodging of Respondent 2 (emphasis in original). While I will skip any state-by-state analysis of the legal treatment of employee handbooks (a source of many lawyers' fees) it is safe to say that the contract law of a number of jurisdictions would treat this disclaimer as fatal to any claim an employee

might make to enforce the seniority policy over an employer's contrary decision.[3]

With US Airways itself insisting that its seniority system was noncontractual and modifiable at will, there is no reason to think that Barnett's accommodation would have resulted in anything more than minimal disruption to US Airways's operations, if that. Barnett has shown his requested accommodation to be "reasonable," and the burden ought to shift to US Airways if it wishes to claim that, in spite of surface appearances, violation of the seniority scheme would have worked an undue hardship. I would therefore affirm the Ninth Circuit.

---

[3] The Court would allow a plaintiff to argue that a particular system was so riddled with exceptions so as not to engender expectations of consistent treatment. *Ante,* at 405–406.